No. 23-12663

# In the United States Court of Appeals for the Eleventh Circuit

RENÉ GARCIA, ET AL.,
*Plaintiffs–Appellees–Cross-Appellant,*

v.

EXECUTIVE DIRECTOR,
FLORIDA COMMISSION ON ETHICS, ET AL.,
*Defendants–Appellants–Cross-Appellees.*

## APPELLANTS' INITIAL BRIEF

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:22-CV-24156-BB

ASHLEY MOODY
*Attorney General*

October 25, 2023

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 414-2672 (fax)
*henry.whitaker@myfloridalegal.com*

HENRY C. WHITAKER
*Solicitor General*
DANIEL WILLIAM BELL
*Chief Deputy Solicitor General*
NATHAN A. FORRESTER
*Senior Deputy Solicitor General*
ALISON E. PRESTON
*Deputy Solicitor General*

*Counsel for Defendants–Appellants–Cross Appellees*

*Garcia v. Executive Director, Florida Commission on Ethics*
*Eleventh Circuit Case No. 23-12663*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Counsel for Appellants certifies that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3 and 28-1(b):

1.    Anchors, Michelle, in her official capacity as Commissioner on the Florida Commission on Ethics, *Defendant-Appellant-Cross Appellee*

2.    Bell, Daniel, *Attorney for Appellants-Cross Appellees*

3.    Bernard, Mack, *Plaintiff*

4.    Bloom, Beth, *U.S. District Court Judge for the Southern District of Florida*

5.    Book, Ronald, *Attorney for Plaintiffs-Appellees-Cross Appellant*

6.    Brodeen, Karen Ann, *Attorney for Defendants (withdrew 05/01/2023)*

7.    Campaign Legal Center, *Amicus Curiae in Support of Defendants*

8.    Cervone, William P., in his official capacity as Commissioner on the Florida Commission on Ethics, *Defendant-Appellant-Cross Appellee*

9.    Coffey Burlington, PL

10.    Coffey, Kendall, *Attorney for Plaintiffs-Appellees-Cross Appellant*

11.    Ezray, Evan, *Attorney for Appellants-Cross Appellees (withdrew 05/05/2023)*

12.    Fernández, Javier, *Plaintiff-Appellee-Cross Appellant*

13.    Fernandez, Robert Henry, *Attorney for Plaintiffs-Appellees-Cross Appellant*

14.    Figgers, Freddie, in his official capacity as Commissioner on the Florida

*Garcia v. Executive Director, Florida Commission on Ethics*
*Eleventh Circuit Case No. 23-12663*

Commission on Ethics, *Defendant-Appellant-Cross Appellee* (*see* Fed. R. App. P. 43(c)(2))

15.    Florida Commission on Ethics

16.    Florida Office of the Attorney General

17.    Forrester, Nathan, *Attorney for Appellants-Cross Appellees*

18.    Gaetz, Don, in his official capacity as Vice Chairman of the Florida Commission on Ethics, *Defendant-Appellant-Cross Appellee*

19.    Garcia, René, *Plaintiff-Appellee*

20.    Grant, John, in his official capacity as Commissioner on the Florida Commission on Ethics (term expired June 2023), *former Defendant-Appellant-Cross Appellee*

21.    Gilzean, Jr., Glenton ("Glen"), in his official capacity as Chairman of the Florida Commission on Ethics (resigned 08/22/2023), *former Defendant-Appellant*

22.    Hiaasen, Scott, *Attorney for Plaintiffs-Appellees-Cross Appellant*

23.    Kuehne, Benedict, *Attorney for Plaintiffs-Appellees-Cross Appellant*

24.    Kuehne Davis Law, P.A.

25.    Leeper, Simone, *Attorney for Amicus Curiae CLC in Support of Defendants*

26.    Lukis, Ashley, in her official capacity as Commissioner on the Florida Commission on Ethics, *Defendant-Appellant-Cross Appellee* (*see* Fed. R. App. P. 43(c)(2))

27.    Meggs, William N., in his official capacity as Commissioner on the Florida Commission on Ethics (term expired June 2023), *former Defendant-Appellant*

28.    Moody, Ashley, in her official capacity as Attorney General for the State of Florida, *Defendant-Appellant-Cross Appellee*

*Garcia v. Executive Director, Florida Commission on Ethics*
*Eleventh Circuit Case No. 23-12663*

29.    Moore, Ed H., in his official capacity as Commissioner on the Florida Commission on Ethics, *Defendant-Appellant-Cross Appellee*

30.    Morse, Stephanie, *Attorney for Defendants*

31.    Newton, Sr., Wengay M., in his official capacity as Commissioner on the Florida Commission on Ethics, *Defendant-Appellant-Cross Appellee*

32.    Patel, Anita, *Attorney for Defendants*

33.    Patronis, Jimmy, in his official capacity as Chief Financial Officer of the State of Florida, *Defendant-Appellant-Cross Appellee*

34.    Preston, Alison E., *Attorney for Defendants-Appellants-Cross Appellees*

35.    Proctor, William, *Plaintiff*

36.    Ronald L. Book, P.A.

37.    RHF Law Firm, LLC

38.    Sjostrom, Noah, *Attorney for Defendants*

39.    Stillman, Kerrie J., in her official capacity as Executive Director of the Florida Commission on Ethics *Defendant-Appellant-Cross Appellee*

40.    Teegen, Elizabeth, *Attorney for Defendants*

41.    Wagar, Crystal, *Plaintiff (terminated 02/14/2023)*

42.    Waldman, Jim, in his official capacity as Commissioner on the Florida Commission on Ethics, *Defendant-Appellant-Cross Appellee*

43.    Whitaker, Henry, *Attorney for Appellants-Cross Appellees*

*Garcia v. Executive Director, Florida Commission on Ethics*
*Eleventh Circuit Case No. 23-12663*

## CORPORATE DISCLOSURE STATEMENT

Not applicable.

## ORAL ARGUMENT STATEMENT

Appellants respectfully submit that oral argument would aid the Court in resolving this appeal. This appeal presents an issue of first impression for the Court—whether restrictions on elected officials' speech are subject to the deferential balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), as adapted by *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454 (1995). The challenged restriction is also complex because it includes a reticulated scheme of definitions.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT ........................................................................ C-1

ORAL ARGUMENT STATEMENT ...................................................................... i

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iv

STATEMENT OF JURISDICTION ..................................................................... xi

STATEMENT OF THE ISSUES ......................................................................... xii

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE CASE ............................................................................. 2

    A.    Background ..................................................................................... 2

    B.    Procedural History ........................................................................ 8

    C.    Standard of Review ..................................................................... 10

SUMMARY OF ARGUMENT ........................................................................... 11

ARGUMENT ..................................................................................................... 12

I.    Florida's restriction on paid lobbying by current public officeholders
    satisfies the deferential balancing test set forth in *NTEU*. ................................. 12

    A.    The district court erred in applying strict scrutiny. ................................... 13

    B.    Florida's in-office, paid-lobbying restriction easily survives *NTEU*
        balancing. ..................................................................................... 18

        1.    Florida's interest in preventing the harmful consequences of
            current officeholders' receiving money to lobby is weighty. ........ 19

        2.    The restriction on receipt of fees for lobbying while in office
            prevents distortion of the democratic process in a direct and
            material way and is tailored to that interest. ................................... 23

3.      Paid lobbying by current public officeholders has limited communicative or expressive value. .................................................. 29

4.      The restriction on receipt of fees requires less justification than a restriction on reimbursements and puts a minimal burden on audience interests. ........................................................ 30

5.      The restriction is neither content- nor viewpoint-based. .............. 31

C.      Alternatively, Florida's in-office, paid-lobbying restriction is subject to intermediate scrutiny, which it also easily survives. ............................. 33

II.     The district court abused its discretion in issuing a universal permanent injunction. ...................................................................................................... 35

A.      An injunction limited to Garcia would afford him all the relief to which he is entitled. ...................................................................................... 35

B.      Neither facial invalidity nor overbreadth standing entitles Garcia to universal relief. ........................................................................................... 39

CONCLUSION ...................................................................................................... 43

CERTIFICATE OF COMPLIANCE ............................................................... 44

CERTIFICATE OF SERVICE .......................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*,
717 F.3d 851 (11th Cir. 2013) ....................................................... 35

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*,
522 F.3d 1200 (11th Cir. 2008) ..................................................... 10

*Bd. of Cnty. Comm'rs v. Umbehr*,
518 U.S. 668 (1996) ....................................................................... 13

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989) ....................................................................... 40

*Boquist v. Courtney*,
32 F.4th 764 (9th Cir. 2022) .......................................................... 17

*Boyle v. Zacharie & Turner*,
31 U.S. 648 (1832) ......................................................................... 36

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) ....................................................... 38

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ....................................................................... 42

*Brockett v. Spokane Arcades, Inc.*,
472 U.S. 491 (1985) ....................................................................... 40

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................................... 19

*Burson v. Freeman*,
504 U.S. 191 (1992) ....................................................................... 26

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ....................................................................... 36

*City & Cnty. of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ............................................................. 38

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
   596 U.S. 61 (2022) ...........................................................................31–32

*Connick v. Myers,*
   461 U.S. 138 (1983) ............................................................................ 14

*Crandon v. United States,*
   494 U.S. 152 (1990) .........................................................................19–21

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ............................................................................ 35

*Doran v. Salem Inn, Inc.,*
   422 U.S. 922 (1975) ......................................................................35, 41

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) ............................................................................ 10

*Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.,*
   470 U.S. 480 (1985) ......................................................................19, 33

*Fed. Election Comm'n v. Cruz,*
   596 U.S. 289 (2022) .........................................................................22–23

*FF Cosms. FL, Inc. v. City of Miami Beach,*
   866 F.3d 1290 (11th Cir. 2017) ........................................................... 42

*Fla. Ass'n of Prof. Lobbyists, Inc. v. Div. of Legis. Info. Servs. of Fla. Office of Legis. Servs.,*
   525 F.3d 1073 (11th Cir. 2008) ........................................................... 32

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
   11 F.4th 1266 (11th Cir. 2021) ........................................................... 34

*Garrido v. Dudek,*
   731 F.3d 1152 (11th Cir. 2013) ........................................................... 11

*Georgia v. President of the U.S.,*
   46 F.4th 1283 (11th Cir. 2022) ........................................................35–37

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ........................................................................ 35

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999).........................................................................36

*Hansberry v. Lee*,
    311 U.S. 31 (1940)..........................................................................37

*Harman v. City of New York*,
    140 F.3d 111 (2d Cir. 1998) ..........................................................15

*Jones v. Governor of Fla.*,
    975 F.3d 1016 (11th Cir. 2020) (en banc) ....................................11

*Joy v. Wirtz*,
    13 F. Cas. 1172 (C.C.D. Pa. 1806) ..............................................36

*Lewis v. Casey*,
    518 U.S. 343 (1996)..................................................................35, 38

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994).......................................................................36

*McCutcheon v. Fed. Election Comm'n*,
    572 U.S. 185 (2014)................................................... 19, 22–23, 36

*Miller v. Ziegler*,
    __ F. Supp. 3d __, No. 21-cv-4233,
    2023 WL 2719472 (W.D. Mo. Mar. 30, 2023)............................20

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).......................................................................35

*NetChoice, LLC v. Att'y Gen.*,
    34 F.4th 1196 (11th Cir. 2022) ....................................................33

*Nev. Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011)..................................................................32, 34

*New York v. Ferber*,
    458 U.S. 747 (1982).......................................................................42

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*,
    50 F.4th 1126 (11th Cir. 2022) ....................................................25

*O'Laughlin v. Palm Beach Cnty.*,
30 F.4th 1045 (11th Cir. 2022) .......................................................... 14–15, 18

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ................................................................. 9, 16

*Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*,
235 F.3d 1243 (10th Cir. 2000) ..................................................................... 17

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968) ........................................................... i, 2, 11, 13–14

*Rankin v. McPherson*,
483 U.S. 378 (1987) .............................................................................. 13, 15

*Renne v. Geary*,
501 U.S. 312 (1991) ...................................................................................... 40

*Rodgers v. Bryant,*
942 F.3d 4514 (8th Cir. 2019) ...................................................................... 37

*Sanjour v. EPA*,
56 F.3d 85 (D.C. Cir. 1995) (en banc) ......................................... 15, 23, 25–26, 30–31

*Scott v. Donald*,
165 U.S. 107 (1897) .................................................................................. 37–38

*Scott v. Donald*,
165 U.S. 58 (1897) ........................................................................................ 37

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) ...................................................................................... 40

*Siefert v. Alexander*,
608 F.3d 974 (7th Cir. 2010) ........................................ 15–17, 19, 21–24, 29, 32–33

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991) ...................................................................................... 16

*Smith v. Swormstedt*,
57 U.S. (16 How.) 288 (1853) ....................................................................... 36

*Snepp v. United States*,
444 U.S. 507 (1980) ...................................................................................... 12

*Supreme Tribe of Ben Hur v. Cauble,*
   255 U.S. 356 (1921) ................................................................................ 36

*Swartzwelder v. McNeilly,*
   297 F.3d 228 (3d Cir. 2002) ................................................................... 30

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ............................................................... 35–36, 39

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
   413 U.S. 548 (1973) ................................................................... 15, 27–32

*United Pub. Workers of Am. (C.I.O.) v. Mitchell,*
   330 U.S. 75 (1947) .................................................................................. 28

*United States v. Hansen,*
   599 U.S. 762 (2023) .......................................................................... 40, 43

*United States v. Nat'l Treasury Emps. Union,*
   513 U.S. 454 (1995) ..................... i, 2, 11–15, 18–19, 21–23, 25, 27–28, 30–31, 35, 41

*United States v. Williams,*
   553 U.S. 285 (2008) ............................................................................... 40

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ............................................................................... 43

*Warth v. Seldin,*
   422 U.S. 490 (1975) ............................................................................... 40

*Waters v. Churchill,*
   511 U.S. 661 (1994) ............................................................................... 13

*Williams-Yulee v. Fla. Bar,*
   575 U.S. 433 (2015) .......................................................................... 16, 23

*Wolfe v. Barnhart,*
   446 F.3d 1096 (10th Cir. 2006) ........................................................ 23, 30

## Constitutions & Statutes

5 U.S.C. § 706 ........................................................................................... 36

28 U.S.C. § 1291 ........................................................................................ xi

28 U.S.C. § 1331 ........................................................................................... xi

42 U.S.C. § 1983 ........................................................................................... xi

Ala. Code § 36-25-23 ..................................................................................... 1

Ark. Code § 21-8-103 ..................................................................................... 1

Conn. Gen. Stat. § 2-16a ................................................................................. 1

D.C. Code § 1-1162.31 ................................................................................... 1

Fla. Const. art. II, § 8 .................................................................................... 19

Fla. Const. art. II, § 8(f) ............................... xii, 1, 5–6, 9, 11, 24–25, 31

Fla. Const. art. II, § 8(h)(2) .......................................................................... 26

Fla. Stat. § 112.3121 ................................... xii, 1, 6–8, 24–26, 31–32

Fla. Stat. § 112.313 .............................................................. 4, 26, 28–29

Ind. Code § 2-7-5-1 ........................................................................................ 1

Iowa Code § 68B.5A ...................................................................................... 1

Kan. Stat. § 46-232 ......................................................................................... 1

Ky. Rev. Stat. § 6.811 ..................................................................................... 1

Me. Stat. tit. 1, § 1014 .................................................................................... 1

Minn. Stat. § 3.084 ......................................................................................... 1

Miss. Code § 5-8-13 ....................................................................................... 1

Mo. Const. art. III, § 2 ................................................................................... 1

N.C. Gen. Stat. § 120C-304 ........................................................................... 1

N.H. Rev. Stat. § 21-G:25 .............................................................................. 1

N.J. Stat. § 52:11-71 ....................................................................................... 1

Okla. Stat. tit. 74, § 4254 ............................................................................... 1

Or. Rev. Stat. § 171.756 ................................................................................. 1

S.C. Code § 2-17-15 ....................................................................................... 1

W. Va. Code § 6B-3-2 .................................................................................... 1

**Eleventh Circuit Stay Orders**

*Garcia v. Exec. Dir., Fla. Comm'n on Ethics*,
   No. 23-10872 (11th Cir. June 5, 2023) .................................................... 9, 39

*HM Florida-ORL, Inc. v. Gov. of Fla.*,
   No. 23-12160, 2023 WL 6785071 (11th Cir. Oct. 11, 2023) ..................... 40

**Other Authorities**

Frederic Calvert, *A Treatise upon the Law Respecting Parties to Suits in Equity*
   (2d ed. 1847) ............................................................................................ 37

Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and
   America* (2d ed. 1839) .............................................................................. 37

Joseph Story, *Commentaries on Equity Pleadings* (4th ed. 1848) ......................... 37

Fla. Comm'n on Ethics, *Conflict of Interest; Voting Conflicts: Member of County Commission
   Lobbying for Compensation on Behalf of Municipal Clients Before Federal and State Government
   Agencies Other Than His County*, CEO 23-6 (Oct. 25, 2023) ................... 28–29

Seth F. Kreimer, *Good Enough for Government Work: Two Cheers for Content Neutrality*,
   16 U. Pa. J. Const. L. 1261 (2014) ........................................................... 14

Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853 (1991) ............... 41

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
   131 Harv. L. Rev. 417 (2017) ................................................................... 36

Henry P. Monaghan, *Overbreadth*, 1981 Sup. Ct. Rev. 1 (1982) ......................... 41

Michael S. Kang, *The End of Campaign Finance Law*, 98 Va. L. Rev. 1 (2012) ............. 4, 23

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) .............. 36

## STATEMENT OF JURISDICTION

Plaintiffs' suit invoked the district court's jurisdiction under 28 U.S.C. § 1331 because they brought a claim under 42 U.S.C. § 1983 and the First and Fourteenth Amendments. Defendants appealed under 28 U.S.C. § 1291 the district court's final judgment granting summary judgment and a permanent injunction. The district court entered the permanent injunction on August 9, 2023, DE110; DE111, and Defendants filed a timely notice of appeal on August 11, 2023, DE112.

## STATEMENT OF THE ISSUES

1.    Whether Florida's in-office, paid-lobbying restriction—found in Article II, Section 8(f)(1)–(2) of the Florida Constitution and implemented by Section 112.3121, Florida Statutes—violates the First Amendment.

2.    Whether the district court abused its discretion by enjoining the State Defendants from enforcing the restriction against all "public officers" in the State, regardless of whether those officers were plaintiffs in the case or suffered injury in fact from enforcement of the restriction.

# INTRODUCTION

Eighty percent of Floridians voted to "secure and sustain" the "public trust" of "public office" "against abuse" by amending the Florida Constitution to prevent the State's public officials from lobbying for pay on political matters while in office. *See* Fla. Const. art. II, § 8(f)(1)–(2). The Florida Legislature followed suit with legislation to focus enforcement of the restriction on the precise abuses of office the constitutional provision was designed to prevent. Fla. Stat. § 112.3121. Like similar provisions in many other states, some much broader than Florida's,[1] the in-office, paid-lobbying restriction secures the public trust by prohibiting (1) those who hold inherently or apparently influential offices from (2) influencing governmental actions or decisions that are or appear to be vulnerable to such influence (3) under circumstances that would reasonably shake public trust in those officeholders. Fla. Const. art. II, § 8(f)(1)–(2), (4); Fla. Stat. § 112.3121.

The district court erred first and foremost by concluding that the in-office, paid-lobbying restriction was subject to strict scrutiny. Because it applies to government employees, the court should have analyzed it under the deferential balancing test set forth

---

[1] *See, e.g.*, Ala. Code § 36-25-23(a); Ark. Code § 21-8-103; Conn. Gen. Stat. § 2-16a; D.C. Code § 1-1162.31(f); Ind. Code § 2-7-5-1; Iowa Code § 68B.5A(1); Kan. Stat. § 46-232; Ky. Rev. Stat. § 6.811(8); Me. Stat. tit. 1, § 1014(2-A); Minn. Stat. § 3.084; Miss. Code § 5-8-13(4); Mo. Const. art. III, § 2(a); N.H. Rev. Stat. § 21-G:25(I); N.J. Stat. § 52:11-71; N.C. Gen. Stat. § 120C-304(a)–(c); Okla. Stat. tit. 74, § 4254; Or. Rev. Stat. § 171.756(4); S.C. Code § 2-17-15; W. Va. Code § 6B-3-2(e).

in *Pickering v. Board of Education*, 391 U.S. 563 (1968), as modified by *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454 (1995). The restriction here easily passes muster under that test.

The district court erred secondarily in enjoining application of the restriction to anyone, anywhere, despite the district court's determination that just one plaintiff had standing. Should this Court disagree with the State Defendants and affirm the district court's First Amendment ruling, it should, at minimum, narrow the injunction to apply only to the plaintiff with standing. This accords with the traditional equitable principles that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs, and that courts should take care to make no decree that affects the rights of nonparties.

## STATEMENT OF THE CASE

### A.    Background

Florida's Constitution Revision Commission (CRC) convenes every 20 years "to examine the Florida Constitution and propose changes for voter consideration" based on what "matter[s] most to Floridians." *About the CRC*, Constitution Revision Commission 2017–2018, https://tinyurl.com/27wfuhfv (last visited Oct. 25, 2023). From 2017 to 2018, the CRC gathered extensive evidence about a growing "corruption crisis" in

state and local government. DE87-17 at 2.[2] It held 15 public hearings across the State; received "testimony from thousands of individuals" as well as "private conversations" and "e-mails"; and conducted a survey of other states' practices in addressing public corruption. DE87-6; DE87-8 at 12, 42; *see* DE87-8 at 27, 29–30, 34. It also drew upon "the shared experiences of 37 members . . . who understood how public office worked and . . . what the [obvious] conflicts are and can be" resulting from paid lobbying while in public office. DE87-8 at 26, 29.

The upshot of all this evidence was that Floridians "didn't trust public officials and thought that public officials were conflicted." *Id.* at 25–26; *see id.* at 27–28. From 1976 to 2010, "Florida's federal courts . . . convicted 1,762 individuals for public corruption," "an average of 50 public corruption convictions a year, or about one a week for the last 35 years." DE87-17 at 3. In the 2000s, "the average number of federal public corruption convictions per year increased to 71," "indicating an upward trend in the modern era." *Id.* at 3. That decade, "Florida led the U.S. in federal public corruption convictions" and "was the top state . . . five times." *Id.* at 2–3. The Nineteenth Statewide Grand Jury also uncovered "malfeasance, misfeasance and nonfeasance" by the Broward County School Board that was "best . . . explained by corruption of our officials by contractors, vendors and their lobbyists." DE87-16 at 2. Specifically, the Board

---

[2] "DE__ at __" citations refer first to the CM/ECF-generated document number and second to the PDF page number in that document. Unless otherwise indicated, a "DE" citation comes from the docket in the district court.

had "attempt[ed] to influence [District executive] staff regarding official business," *id.* at 50, and "intrud[ed] into [District executive] decisions such as selecting building contractors, . . . directing contracts to friends and acquaintances for consulting work, pushing unnecessary building projects in direct opposition to the advice of district officials, [and] lobbying construction change orders [more expensive to the public] to benefit contractors," *id.* at 3; *see id.* at 36.

Although the Florida Legislature had taken some measures to address such concerns, gaps remained.[3] In particular, it remained legal for public officials to sell their access and influence by accepting compensation to lobby on behalf of private interests. *See* DE87-17 at 10; DE87-21 at 73–74; DE87-8 at 29–31, 34–35, 102–05, 152. For example, a sitting county commissioner in Walton County was reported to have "rotate[d] contracts for [a trash removal] company with counties in northwest Florida." DE87-8 at 31, 198. A sitting school superintendent sold services related to evaluating roof replacements "to other school districts." *Id.* at 192–93. A sitting county commissioner

---

[3] For example, the Florida Legislature had "strengthen[ed] the Code of Ethics for public officers and employees in Part III, Chapter 112, Florida Statutes." DE87-15 at 7; DE87-21 at 73. And the 1999 Public Corruption Study Commission had recommended criminalizing more effectively "the most egregious and explicit form[s] of quid pro quo corruption," including bribery, unlawful compensation or reward for official behavior, official misconduct, criminal misuse of official position, and bid-tampering. DE87-15 at 7–14; Michael S. Kang, *The End of Campaign Finance Law*, 98 Va. L. Rev. 1, 58 (2012) (describing bribery). But the requirement commonly found in those laws, that the public official act "corruptly" or "with corrupt intent," *e.g.*, DE87-15 at 10–13; DE87-8 at 222 (discussing Fla. Stat. § 112.313(6)), was "too high a burden and too high a bar . . . for many prosecutors to get over," DE87-8 at 222.

turned sitting state senator, while continuing to hold each office, lobbied for pay for the Salvation Army and "secured millions of dollars from local governments." *Id.* at 197–98. The sitting vice chairman of a county water management district board—"as his principal job" working for a company that sold pumps—lobbied "other municipalities and areas." *Id.* at 207–08. And one public official testified that other officeholders "tried to trade on their relationships in order to get in the door and plead for a private client." *Id.* at 178–79. He also testified that a state senator told him that while voting on redistricting, the state senator lobbied members of the Florida Congressional delegation. *Id.* at 54–57. And that senator wasn't the only one. *Id.* at 55.

The CRC thus proposed an amendment to "[e]nd[] [the] practice" of "public stewards" "monetizing public service for private gain," DE87-20 at 115–16; DE87-21 at 99; *see* DE87-8 at 50; DE87-19 at 185—for example, by "serving on the County Commission while simultaneously lobbying another local government that has interconnected interests," DE87-20 at 115. In 2018, over 6.1 million Floridians—78.9% of voters—approved this amendment. Fla. Dep't of State, Division of Elections, *Nov. 6, 2018 General Election Official Results*, *available at* https://tinyurl.com/4ydjsmru (last visited Oct. 25, 2023); *see also* DE87-2 at 2. As a result of the amendment, the Florida Constitution now provides that elected and executive-level public officials "shall not lobby for compensation on issues of policy, appropriations, or procurement before the federal government, the legislature, any state government body or agency, or any political subdivision of this state, during [their] term[s] of office." Fla. Const. art. II, § 8(f)(1)–(2).

Those officers are also prohibited from such lobbying for six years after leaving public office, depending on the office they leave and whom they want to lobby. *Id.* art. II, § 8(f)(3).

In 2021 and 2022, the Florida House of Representatives and Senate unanimously passed legislation implementing the amendment. *See* Fla. House of Representatives, CS/CS/HB 7001, *Implementation of the Constitutional Prohibition Against Lobbying by a Public Officer* (2022), https://tinyurl.com/yk3jra9d. By defining "issue of appropriation," "issue of policy," "issue of procurement," and "lobby," Section 112.3121 targets governmental actions or decisions where political influence can be wielded to affect the outcome. These actions include:

- "a legislative decision to expend or approve an expenditure of public funds," Fla. Stat. § 112.3121(7);

- "a change in a law or an ordinance," *id.* § 112.3121(8);

- "a decision, plan, or course of action designed to influence or determine the subsequent decisions or actions of a governmental entity, to sell or otherwise divest public property, or to regulate conduct," *id.*;

- "a proposal to purchase or acquire property, an interest in property, or services by a governmental entity," *id.* § 112.3121(9); or

- "a decision of the legislative or executive branch of the United States government for which registration as a lobbyist is required," *id.* § 112.3121(11)(a)4.

At the same time, Section 112.3121 does not apply to actions where influence is unlikely to affect the outcome, such as:

- "administrative actions," *id.* § 112.3121(1), (11)(a)1. & 3., defined as

  o "any process or decision regulated by [Florida's APA]," *id.* § 112.3121(1); or

  o "for a state government body or agency or a political subdivision not subject to [Florida's APA]," *id.*,

    ▪ "any action or a decision on a license, permit, waiver of regulation, development order or permit, or development agreement," *id.*;

    ▪ "any quasi-judicial proceeding on local government land use matters regulated by s. 286.0115(2)," *id.*;

    ▪ "any decision subject to judicial review by petition for writ of certiorari or as otherwise prescribed by general law," *id.*;

    ▪ "any other administrative procedure or procedure governed by existing law, ordinance, rule, or regulation, except on an issue of procurement," *id.*; or

- "a decision or determination of any rights, duties, or obligations made on a case-by-case basis," *id.* § 112.3121(8).

By defining "lobby" and "lobby for compensation," the statute also excludes circumstances where political influence is being wielded consistently with an office-holder's obligations to the public, *see id.* § 112.3121(12)(b)1.; political influence is likely not being wielded at all, *see id.* § 112.3121(11)(b)1. & 3., (12)(b)2.–6.; or an officeholder likely could not have procured for pay the circumstance where political influence could be wielded, *see id.* § 112.3121(11)(b)2.–3. And by excluding from the definition of "lobby for compensation" "[a] public or private employee, including an officer of a private business, nonprofit entity, or governmental entity, acting in the normal course of his or

7

her duties, unless he or she is principally employed for governmental affairs," the statute allows the citizens who run Florida's government to interact with government incidental to conducting their private business, so long as dealing with government is not their "principal or most significant responsibility." *See id.* § 112.3121(12)(b)2., (15).

### B.    Procedural History

Plaintiffs are current public officeholders. René Garcia is a Miami-Dade Commissioner. DE19-3 ¶ 2. He is also Executive Vice President of "a business consulting firm [he] co-founded whose services include lobbying and government affairs advisory services." *Id.* ¶ 4. Javier Fernández is the Mayor of the City of South Miami and is an attorney with a law firm. DE42-1 ¶¶ 2–4. Mack Bernard and William Proctor are county commissioners. DE1 ¶¶ 12–13.

Plaintiffs sued a host of State Defendants, including Kerrie J. Stillman, Executive Director of the Florida Commission on Ethics, in their official capacities, challenging the in-office, paid-lobbying restriction both as applied and on its face. Plaintiffs contended that the restriction violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. DE1. Plaintiffs also moved for a preliminary injunction. DE19. After a hearing, the district court granted the preliminary injunction against enforcement of the restriction throughout the State. DE52 at 23. Defendants appealed, DE56, and moved to stay the preliminary injunction to the extent it barred enforcement against public officers other than Garcia and Fernández, the only two Plaintiffs who the court had found to have standing, DE57; *see* DE52 at 11. The district

court denied the motion for a partial stay, DE77, but a motions panel of this Court granted it, Order of the Court at 2–3, *Garcia v. Exec. Dir., Fla. Comm'n on Ethics*, No. 23-10872 (11th Cir. June 5, 2023), DE33 ("PI Order").

Meanwhile, in district court, the State Defendants moved to dismiss on the grounds that Plaintiffs lacked standing and failed to state a plausible claim for relief. DE44. In an order granting in part and denying in part the motion, the court concluded that only Garcia and Fernández had standing to challenge the in-office, paid-lobbying restriction. DE65 at 8–14. The court also ruled that Plaintiffs had failed to allege "a freestanding Equal Protection claim." DE65 at 20.

After discovery, both sides moved for summary judgment. The district court ruled mostly in Plaintiffs' favor. On jurisdiction, the court concluded that Fernández lacked standing to challenge the restriction, leaving Garcia as the only plaintiff. DE110 at 10–12. On the merits, the district court held that the restriction was content-based because it banned lobbying only "on issues of policy, appropriations, or procure-ment"—a "subject matter[]" distinction. *Id.* at 16–20 (quoting Fla. Const. art. II, § 8(f)(2), and *Otto v. City of Boca Raton*, 981 F.3d 854, 862 (11th Cir. 2020)). The court thus applied strict scrutiny and concluded that the restriction failed because it was not narrowly tailored to serve the compelling state interest in preventing quid pro quo cor-ruption and its appearance. *Id.* at 20–38. And even though this Court had partially stayed the preliminary injunction pending appeal, ruling that nothing "warrants its broad ap-plication to every 'public officer'" in the State, PI Order at 2, the district court again

9

granted a statewide injunction, this one permanent, as to the in-office, paid-lobbying restriction. DE110.[4]

The State Defendants appealed. DE112. They also moved in the district court to stay the permanent injunction to the extent it barred Defendants from enforcing the in-office restriction against anyone other than Garcia. DE113. The district court denied that motion. DE118. The State Defendants then moved in this Court to stay the permanent injunction on the same grounds, but as of the filing of this brief, the Court had not ruled on that stay motion.

### C.    Standard of Review

"Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

This Court reviews the decision to enter a permanent injunction for abuse of discretion but reviews the underlying legal conclusions de novo and any factual findings

---

[4] This in turn mooted the State Defendants' preliminary-injunction appeal. Order of the Court at 2, *Garcia v. Exec. Dir., Fla. Comm'n on Ethics*, No. 23-10872 (11th Cir. Sept. 19, 2023), DE47-2.

for clear error. *See Jones v. Governor of Fla.*, 975 F.3d 1016, 1028 (11th Cir. 2020) (en banc). It reviews the scope of any injunction for abuse of discretion. *See Garrido v. Dudek*, 731 F.3d 1152, 1158 (11th Cir. 2013). Because the district court erred in its legal conclusion that Florida's in-office, paid-lobby restriction violated the First Amendment, this Court owes the district court no deference and should reverse. *See Jones*, 975 F.3d at 1025 ("Because [the plaintiffs] failed to prove a violation of the Constitution, we reverse the judgment of the district court and vacate the challenged portions of its injunction.").

## SUMMARY OF ARGUMENT

Florida's in-office, paid-lobbying restriction does not violate the First Amendment. Under *Pickering* and *NTEU*, any restriction on the speech of government employees, elected or not, is weighed against the government's interest in ensuring that its employees do their jobs effectively and efficiently. Florida's restriction survives this balancing because the State's interest outweighs the interests of the lobbied and of office-holders in receiving money for lobbying on political matters. Paid lobbying by public officials threatens the integrity of and public confidence in democracy. It does not matter whether the category of political business—in this case, "issues of policy, appropriations, or procurement," Fla. Const. art. II, § 8(f)(2)—is considered content-based or content-neutral. Regulating that type of decision-making is justified because it carries the precise risks of untoward influence that Florida is trying to prevent.

In any event, the in-office, paid-lobbying restriction is not content-based. As the district court itself conceded, "[i]t is unclear what types of lobbying would pertain to an

issue *other* than 'policy, appropriations, or procurement.'" DE52 at 15 n.3. Thus even if *Pickering*/*NTEU* did not apply, the restriction here would be subject only to intermediate scrutiny. It survives this scrutiny because it is narrowly tailored to serve a significant government interest, and it leaves open alternative channels of communicating—i.e., lobbying without pay.

Finally, even if the in-office, paid-lobbying restriction were unconstitutional, the district court abused its discretion by extending injunctive relief to public officers other than Garcia. Because Garcia's injury is limited to the fear of enforcement against him, the court could have afforded complete relief by enjoining the State Defendants from enforcing the restriction against only him. By enjoining the restriction as to all public officers in the State, the district court departed from traditional equitable practice. That departure cannot be justified by facial overbreadth.

## ARGUMENT

### I.    FLORIDA'S RESTRICTION ON PAID LOBBYING BY CURRENT PUBLIC OFFICE-HOLDERS SATISFIES THE DEFERENTIAL BALANCING TEST SET FORTH IN *NTEU*.

"In *Pickering* and a number of other cases [the Supreme Court has] recognized that Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 465 (1995) (citing *Snepp v. United States*, 444 U.S. 507 (1980) (per curiam)). "When a court is required to determine the validity of such a restraint, it must 'arrive at a balance between the interests of the [employee],

of a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 465–66 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). This is because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in [regulating] the speech of the citizenry in general." *Pickering*, 391 U.S. at 568; *see also Rankin v. McPherson*, 483 U.S. 378, 384 (1987) ("This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment."). Put another way, "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 676 (1996) (quoting *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality op.)). Under this test, Florida's in-office, paid-lobbying restriction prevails.

## A.    The district court erred in applying strict scrutiny.

The fundamental error of the district court throughout this case has been its insistence that strict scrutiny applies, instead of the deferential balancing test set forth in *Pickering* and *NTEU*. In its order granting a preliminary injunction, the court asserted, incorrectly, that "because the Lobbying Restrictions are not content neutral, the *NTEU* test cannot apply." DE52 at 15. The court repeated that refrain in its order granting a

13

permanent injunction. DE110 at 14–15. Both the premise and the conclusion are in-correct. As will be discussed, *see infra* Part I.B.5, the in-office, paid-lobbying restriction is content-neutral. But even if it were not, the *Pickering*/*NTEU* balancing test would still apply. The whole point of *Pickering* and *NTEU* is to establish a different test for when a public employee speaks on "a matter of public concern." *NTEU*, 513 U.S. at 466; *see also Pickering*, 391 U.S. at 572 ("issues then currently the subject of public atten-tion"). And in assessing whether the public employer can restrict employee speech of that nature, courts are directed to consider the "*content*, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983) (emphasis added).

Simply put, when the government is regulating its employees' speech based on its interest in providing public services, "'content neutrality' is not central." Seth F. Kreimer, *Good Enough for Government Work: Two Cheers for Content Neutrality*, 16 U. Pa. J. Const. L. 1261, 1266 n.10 (2014). In *NTEU* itself, the Supreme Court held that the speeches and articles subject to the honoraria ban were on matters of public concern because they "were addressed to a public audience, were made outside the workplace, and involved *content* largely unrelated to [the plaintiffs'] employment." 513 U.S. at 466 (emphasis added); *see also id.* at 467 n.11. Courts, including this Court in *O'Laughlin v. Palm Beach County*, 30 F.4th 1045 (11th Cir. 2022), have thus regularly applied *Pickering*/

*NTEU* balancing to content-based distinctions.[5] And they have found such distinctions justified when they are inextricably intertwined with the danger they legitimately target.[6]

The district court said that such an approach "cannot be reconciled with the principle . . . that content-based laws are subject to strict scrutiny." DE110 at 15–16. But that reconciliation is found in *NTEU* itself. *NTEU* explained that the purpose of the test is to assess whether the government can show "adverse *effects*" on the government's special interest, regardless of whether the government also cares about the speech's content. 513 U.S. at 467 n.11. Indeed, *NTEU* acknowledged that "certain messages may be more likely than others to have . . . adverse effects" on the government's interest, indicating that *NTEU* applies even to facially content-based restrictions. *Id.* It is thus beside the point that the honoraria ban in *NTEU* did not "discriminate[] among

---

[5] *See, e.g.*, *Rankin*, 483 U.S. at 390 (applying *Pickering* when public employee was fired "based on the *content* of her speech"); *O'Laughlin*, 30 F.4th at 1054–55 (applying *Pickering* to social-media policy prohibiting speech of fire-department employees that would threaten "morale, discipline, operations, the safety of staff, or perception of the public"); *Sanjour v. EPA*, 56 F.3d 85, 93, 96 (D.C. Cir. 1995) (en banc) (applying *NTEU* to regulations that "restrict[ed] a subcategory of . . . speech on the basis of the viewpoint expressed"); *Harman v. City of New York*, 140 F.3d 111, 117–18 (2d Cir. 1998) (applying *NTEU* to restriction on "employee speech concerning the policies and practices" of government agencies).

[6] *See U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 564–65 (1973) (Hatch Act's partisan distinction was inextricably intertwined with the legitimate aim of preventing the mix of partisan political influence with routine federal service); *Siefert v. Alexander*, 608 F.3d 974, 987 (7th Cir. 2010) (rule that judges could endorse only in nonpartisan elections was "justified" because it reflected practical realities—partisan officials appeared more often in court than did nonpartisan ones, threatening too many recusals—and endorsements in nonpartisan elections would not make a judge look like a "spokesperson for [a] party").

speakers based on the content or viewpoint of their messages." *See* DE110 at 15 (quoting *NTEU*, 513 U.S. at 468).

The cases the district court cited do not support the application of strict scrutiny. One, in fact, is a primer on why strict scrutiny does not apply to this kind of case. In *Siefert v. Alexander*, 608 F.3d 974, 981–83 (7th Cir. 2010), the court applied strict scrutiny to a ban on speech bearing little to no relationship to an official's proper functions, while still applying *Pickering* to a ban on speech threatening those functions. The other cases merely represent the uncontroverted rule that strict scrutiny applies to content-based restrictions that do not serve, or are not alleged to serve, the government's special interest in promoting the efficiency of the public services. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115–17 (1991) (not serving); *Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020) (same); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (plurality op.) (not alleged to serve).[7]

These rules do not change just because the plaintiffs in this case are elected officials. Like rank-and-file government employees, elected officeholders are "employed in the essential day-to-day task of operating" government systems, which "must not only" serve the public but "must also appear to." *See Siefert*, 608 F.3d at 984–85. Even an

---

[7] In *Williams-Yulee*, the State did not argue that *Pickering/NTEU* balancing applied, so that case did not "clarif[y]" which test applies, contrary to the court's suggestion, DE110 at 15 n.6. The takeaway from *Williams-Yulee* is that the State won even under strict scrutiny because of anticipated harm the restricted speech would pose to official functions. *See* 575 U.S. at 444–46 (plurality op. with respect to part II).

elected official's speech can interfere with his performance of those duties and could justify removal from office by whatever constitutional mechanism (impeachment, removal, recall, expulsion) appropriately applies. *See, e.g.*, *id.* at 985 (elected judge's "trading political endorsements" would interfere with his "essential day-to-day task of operating a judicial system that must not only be fair and impartial, but must also appear to the public to be fair and impartial"). The First Amendment does not liberate elected officials from the ethical responsibilities of public office. *NTEU* balancing thus properly applies to restrictions on the speech of elected officials as well. *See id.* at 983–88 (applying modified *Pickering* balancing to an elected judge).

Two other courts of appeals have refused to apply *Pickering* or *NTEU* balancing to elected officials at all. *Boquist v. Courtney*, 32 F.4th 764, 779–80 (9th Cir. 2022) (legislator); *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (members of college board of trustees deemed to "occupy the same positions as elected public officials"). These cases wrongly treat the fact that some elected officials, such as legislators, "have an obligation to take positions on controversial political questions" as reason to set aside *Pickering* and *NTEU* for all elected officials. *Boquist*, 32 F.4th at 780. This Court should not follow that course and instead should recognize that the multi-factor *NTEU* balancing test, discussed next, necessarily takes into account the nature of the elected position at issue. Some public officeholders indeed are charged with taking positions on controversial political questions, and that may well be relevant under the *Pickering*/*NTEU* framework. But those duties do not exempt elected officials from

the framework itself, especially when, as here, the restriction does not bar public office-holders from taking stands on controversial political issues.

### B. Florida's in-office, paid-lobbying restriction easily survives *NTEU* balancing.

In *NTEU*, the Court modified the *Pickering* test for when the restriction on speech arises from a general regulation of public-employee speech as opposed to a "single supervisory decision." *NTEU*, 513 U.S. at 468. Under this modified test, the government need only "show that the interests of [the] potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *O'Laughlin*, 30 F.4th at 1054 (quoting *NTEU*, 513 U.S. at 468). Under that test, Florida's interest in preventing the abuse of public office easily outweighs both potential audiences' and the restricted officeholders' interests in paid lobbying by current officeholders.

In applying *NTEU*, courts consider several factors: the threatened harm's seriousness; the regulation's tailoring; the regulated speech's communicative or expressive value; the burden on audiences and employees; and the regulation's potential for censoring or privileging content, viewpoint, or speakers. Each of these factors strongly favors Florida here.

1.   **Florida's interest in preventing the harmful consequences of current officeholders' receiving money to lobby is weighty.**

Foundational to our democracy is the "trust" Floridians place in elected and executive-level officeholders to use the influence that inheres in their offices for the public's benefit. *See* Fla. Const. art. II, § 8; *NTEU*, 513 U.S. at 473 (comparing relative "power to confer favors"); *Siefert*, 608 F.3d at 986; DE87-8 at 79–80, 85–86, 101, 178–80 (officeholders have inherent influence and bring it to closed-door meetings). And Florida "is entitled to believe" that such influence will follow an officeholder, regardless of whether he "identif[ies]" himself as one. *See Siefert*, 608 F.3d at 986; *see also* DE87-8 at 79–80, 85–86, 101, 178–80 (dignity of office follows public officers, and those receiving them know who is coming to meet with them). On the clock or not, officeholders affect Florida's legitimate interest in "the public's confidence in the integrity of" public service. *Crandon v. United States*, 494 U.S. 152, 164–65 (1990); *see Siefert*, 608 F.3d at 986.

Quid pro quo corruption compromises that foundation, *Buckley v. Valeo*, 424 U.S. 1, 26–27 (1976) (per curiam), especially when it is "dollars for political favors," *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 192 (2014) (plurality op.) (quoting *Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 497 (1985)). Its appearance is "[o]f almost equal concern." *Buckley*, 424 U.S. at 27. "[A] democracy is effective only if the people have faith in those who govern." *Crandon*, 494 U.S. at 165 n.20 (quotation omitted). Floridians' faith in elected and executive-level officeholders is "bound to be

19

shattered when [those officeholders] engage in activities which arouse suspicions" of quid pro quo corruption. *Id.*; *see, e.g.*, DE87-15 at 2 ("Unfortunately, because of a very few corrupt and unethical officials, the public believes that government is not sound."); DE87-16 at 2 (corruption "best … explained" Broward County School Board's misconduct); *id.* at 48–49 ("Unfortunately, based on [the Board's] history . . . , we have no confidence in [its] ability to make meaningful changes and to adhere to them.").

One of those activities is paid lobbying. *See supra* pp. 3–4 (statewide grand jury suspected that "corruption" explained school board "attempt[ing] to influence [District executive] staff," among similar things); *supra* pp. 4–5 (scandals involving public officials lobbying while in office). "[L]obbying more than other types of speech bolsters the appearance of" and "necessarily implicates concerns about *quid pro quo* corruption," especially "when the lobbyist financially profits from the influence he has exerted," because "lobbying involves using political connections to influence decisions." *Miller v. Ziegler*, __ F. Supp. 3d __, No. 21-cv-4233, 2023 WL 2719472, at *8 (W.D. Mo. Mar. 30, 2023). Paid lobbying by current officeholders thus erodes public trust in "those who govern" and thereby effects "an evil which endangers the very fabric of a democratic society." *See Crandon*, 494 U.S. at 165 n.20 (quotation omitted). Preventing it is therefore a "compelling" state interest. *See Nat'l Conservative Pol. Action Comm.*, 470 U.S. at 496; *McCutcheon*, 572 U.S. at 199, 206 (plurality op.); *Miller*, 2023 WL 2719472, at *9 ("compelling interest in preventing *quid pro quo* corruption and its appearance" suggests its presence "counteract[s] the efficient and effective operation" of government); *see also*

*NTEU*, 513 U.S. at 472 (concern that public servants "not misuse or appear to misuse power" is an "undeniably powerful" interest); *cf. Crandon*, 494 U.S. at 164–65 & n.20 (federal conflicts of interest).

Over six million Floridians—78.9% of voters—voted to put Article II, Section 8 in the Florida Constitution, showing that they agreed Florida's in-office, paid-lobbying restriction was necessary to "secure" the "public trust" of "public office" "against abuse." Fla. Dep't of State, Division of Elections, *Nov. 6, 2018 General Election Official Results*, *available at* https://tinyurl.com/4ydjsmru (last visited Oct. 25, 2023); *see also* DE87-2 at 2. The very people who must have faith in those who govern said that lobbying on political matters for pay would undermine that faith. *See Crandon*, 494 U.S. at 165 n.20. And a unanimous House and Senate, plus the Governor, passed the implementing legislation. Floridians thus provided "evidence" that paid lobbying by certain officeholders necessarily affects the government.

In short, paid lobbying by current officeholders necessarily constrains the efficient operation of government. And for balancing purposes, government interest in a regulation is "weighty" when, as here, it ensures that public servants wield political influence or confer favors consistent with their responsibilities to the public. *See Siefert*, 608 F.3d at 985–86.

Because the restriction here reasonably prevents actual or apparent "abus[e]" of "the prestige" and influence inherent in elected or executive-level office, *see id.* at 983, Florida's interest is more like the state's interest in *Siefert*, where a ban was upheld, than

in *NTEU*, where a ban was not. *Siefert* involved a ban on elected judges' publicly endorsing partisan candidates or platforms. There, the state's interest was "preserv[ing] the appearance of impartiality in the judiciary." *Id.* at 984. The court held the ban justified in part because judges could wield political influence through endorsements and that power could "call into question the impartiality of the court." *Id.* at 985–86. By contrast, in *NTEU*, which involved an honoraria ban, the government's interest was preventing rank-and-file employees from misusing power. 513 U.S. at 472. The Supreme Court held the ban not justified in part because rank-and-file employees had "negligible power to confer favors" for pay. *Id.* at 473.[8] Florida is regulating power where it actually lies, like in *Siefert* and unlike in *NTEU*.

Analogizing to the campaign-finance context, the district court disparaged Florida's interest as seeking to "limit the appearance of mere influence or access," as in *Federal Election Commission v. Cruz*, 596 U.S. 289, 308 (2022) (quoting *McCutcheon*, 572 U.S. at 208 (plurality op.)), based on "far too speculative" fears of quid pro quo corruption akin to those in *McCutcheon*, 572 U.S. at 210, about the routing of campaign donations through others to circumvent existing contribution limits. DE110 at 21, 35. That badly misstates the aim of the restriction. Florida is seeking to ensure that public officers are "*appropriately* responsive to the preferences of their supporters," including those who

---

[8] *NTEU*, however, may have "understate[d] the weight that should be accorded to the governmental justifications." 513 U.S. at 489 (Rehnquist, C.J., dissenting); *see id.* at 489–503 (Rehnquist, C.J., dissenting) (criticizing majority's analysis).

lawfully contributed to their campaigns, by wielding their influence only in the public's interest. *See id.* at 21 (quoting *Williams-Yulee*, 575 U.S. at 446–47) (emphasis added). By contrast, the government in *Cruz* was impinging on that proper responsiveness out of concern that "repaying candidate loans after an election" "might" buy "greater influence with or access to the candidate." 596 U.S. at 307–08. Unlike that ex ante restriction in *Cruz*, which threatened "a central feature of democracy," *id.* at 308, and the aggregate limits on contributions to all candidates or committees in *McCutcheon*, 572 U.S. at 192 (plurality op.), Florida's "ex post" restriction applies "after the quid pro quo has actually been agreed to," when public officers are selling, and third parties are buying, the actual or apparent influence of public office for lobbying on certain political actions or decisions. Michael S. Kang, *The End of Campaign Finance Law*, 98 Va. L. Rev. 1, 58 (2012).

### 2. The restriction on receipt of fees for lobbying while in office prevents distortion of the democratic process in a direct and material way and is tailored to that interest.

Florida's restriction satisfies *NTEU* because it "will in fact alleviate [the asserted] harms in a direct and material way." 513 U.S. at 475. *NTEU* balancing does not require "least restrictive means" or "narrow tailoring." *Sanjour v. EPA*, 56 F.3d 85, 98 (D.C. Cir. 1995) (en banc); *Siefert*, 608 F.3d at 985. It requires only that the government have a "substantial interest" in all restricted speech, *see Sanjour*, 56 F.3d at 97, and that the restriction exclude contexts that pose "little risk" of the harm it seeks to prevents, *see Wolfe v. Barnhart*, 446 F.3d 1096, 1107 (10th Cir. 2006); *see also Siefert*, 608 F.3d at 987. Poor tailoring will defeat a restriction on government employee speech only if it "so

23

weakens the ban (and therefore the state's asserted interest in enforcing it) that the scales tip." *Siefert*, 608 F.3d at 987.

Florida's restriction alleviates the threat of financial quid pro quos and their appearance in a direct and material way. It prevents elected and executive-level officers, who wield political influence, from taking, or appearing to take, dollars ("compensation") for political favors ("lobby[ing] . . . on issues of policy, appropriations, or procurement") in derogation of public trust. *See* Fla. Const. art. II, § 8(f)(1)–(2), (4); Fla. Stat. § 112.3121. Florida's restriction is also well-tailored, both in what it includes and in what it excludes. It targets only actions or decisions where sheer political influence can affect the outcome, and excludes contexts that pose "little risk" of the danger sought to be prevented—where sheer political influence likely cannot affect the outcome or its use would not violate the public trust.

The district court concluded that Florida's restriction was underinclusive, because it would allow lobbying (1) on other issues besides "policy, appropriations or procurement" and (2) for the official's or his business's own interests. DE110 at 23. This conclusion was dubious at best. As the district court itself conceded at the preliminary injunction stage, "[i]t is unclear what types of lobbying would pertain to an issue *other* than 'policy, appropriations, or procurement.'" DE52 at 15. In any event, underinclusiveness does not doom a restriction under *NTEU* balancing as it might under strict scrutiny. *See Siefert*, 608 F.3d at 987. And even strict scrutiny allows the government to address the "most acute" "phase of the problem" instead of "strik[ing] at all

evils at the same time." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1138 (11th Cir. 2022). Florida's restriction addresses the most acute phase of the problem by covering those actions or decisions posing the greatest danger of a public official's wielding political influence improperly. *See* Fla. Const. art. II, § 8(f)(2); Fla. Stat. § 112.3121(7), (8), (9). A public officer can accept money to lobby on, for example, decisions governed by Florida's APA, *see, e.g.*, Fla. Stat. § 112.3121(1), (11)(a)1. & 3. (excluding administrative actions from scope of lobbying restriction), because the APA's due-process protections dampen the effect of political influence.

This feature also distinguishes the underinclusiveness deemed to be problematic in *NTEU* and *Sanjour*. In *NTEU*, the honoraria ban was limited to certain "expressive activities"—i.e., "an appearance, speech or article" related to the public employee's official duties—even though compensation for those activities "pose[d] no greater danger than compensation for other services that a Government employee might perform in his or her spare time." 513 U.S. at 474. And in *Sanjour*, the state allowed reimbursements "for luxurious travel and accommodations" associated with unofficial speaking or writing engagements, "so long as the agency approve[d]." 56 F.3d at 95. But "the benefit accruing to an employee from a week relaxing in four-star hotels and regaling on five-course feasts at the expense of a private party [was] in no way diminished by first obtaining agency approval." *Id.* Even under strict scrutiny, if there is "no evidence" that the "abuse[]" of concern is purportedly "commit[ted]" another unaddressed way, the

25

restriction survives. *Burson v. Freeman*, 504 U.S. 191, 207 (1992) ("The First Amendment does not require States to regulate for problems that do not exist.").

The district court also overlooked the obvious justification for the normal-course-of-duties exclusion: Florida's citizen government. Florida prides itself on being governed largely by regular people, not career politicians. *See* DE87-20 at 116–17 ("citizen office holder[s]"); *id.* at 137, 148 (Florida has a "citizen Legislature"). "[M]any, many" Florida public officials, "if not most," are "part-time" and privately employed. DE87-8 at 45, 88; *see* DE87-20 at 148; DE83 at 4 ¶ 16. Private employment and public service could not coexist without a certain balance: The State thus allowed lobbying that is merely incidental to other private work—"in the normal course"—so long as the official is not "principally employed for governmental affairs." *See* Fla. Stat. § 112.3121(12)(b)2. And other laws serve as a backstop, preventing the most egregious abuses from such incidental lobbying. *See, e.g.*, Fla. Const. art. II, § 8(h)(2) (disproportionate benefit); Fla. Stat. § 112.313(6)–(7). Neither the specified "issues" nor the normal-course exclusion thus renders the restriction fatally underinclusive.

The district court also was incorrect to conclude that Florida's restriction is overinclusive on the grounds that the scope does not depend on the public position and that this restriction "unnecessarily duplicate[s] other existing laws." *See* DE110 at 24–25. "If the government has a substantial interest with respect to only a subcategory of the restricted speech, then its interest will not readily outweigh the burden imposed on the larger category of speech subject to regulation." *Sanjour*, 56 F.3d at 97. The district

court opined that Florida's restriction was "extremely broad" because it "categori-cal[ly]" banned lobbying rather than considering "the public officer's position" and where he wants to lobby. DE110 at 24. But no matter the public office or the lobbied government entity making political decisions, Florida has a substantial interest in pre-venting officeholders from being (or appearing to be) bought and paid for in the polit-ical arena while holding public office in public trust. Nearly 80% of voters said so—surely substantial. And while issue- or client-based conflicts might present additional concerns, focus on them would be an "artificially narrow prism." *See NTEU*, 513 U.S. at 495 (Rehnquist, C.J., dissenting).

Florida's reticulated restriction is much like the reticulated Hatch Act, which was not held to be overinclusive in *United States Civil Service Commission v. National Association of Letter Carriers, AFL-CIO*, 413 U.S. 548 (1973). Unlike in *Letter Carriers*, Florida has not had the chance to "flesh[] out" its restriction's meaning "on a case-by-case basis," *id.* at 572, but it can point to "various exclusions," *id.* at 575, that make it not overinclusive. Just as the Hatch Act did not prohibit all political activity, *id.* at 575–76, Florida's re-striction does not prohibit all lobbying activity. Just as the Hatch Act exempted ques-tions "not identified with national or state political parties," *id.* at 576, Florida's re-striction exempted non-political contexts. Just as the Hatch Act "carve[d] out the pro-hibited political conduct from the expressive activity," *id.* at 579, Florida's restriction carves out misusing public office by personally profiting from it by opining on political

matters. And just as the enforcing body there issued advisory opinions, *id.* at 580, here the Commission issues advisory opinions, DE87-5 at 2–3.

In any event, neither Floridians nor the Florida Legislature was "obliged to draw an infinitely filigreed statute to deal with every subtle distinction between various groups of employees." *NTEU*, 513 U.S. at 498 (Rehnquist, C.J., dissenting) (citing *Letter Carriers*, 413 U.S. at 556; *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 99 (1947)). "Whatever differences there may be" are "differences in detail so far as the constitutional power under review is concerned." *Mitchell*, 330 U.S. at 102 (Hatch Act). "Whether there are such differences and what weight to attach to them, are all matters of detail for" the Florida Legislature and Floridians, "not for the courts." *Id.*

The district court was also wrong in thinking that the in-office, paid-lobbying restriction "unnecessarily duplicate[s]" Fla. Stat. § 112.313(6)–(7), about "misuse of public position" and "conflicting employment and contractual relationship[s]," respectively. DE110 at 25. Although some overlap is likely (and innocuous), the restriction picks up where those laws leave off. It catches cases with insufficient evidence of "corrupt[]" mens rea, which might slip through subsection (6). Fla. Stat. § 112.313(6). It also covers cases that subsection (7) would not—where, for example, public officers claim to have not been acting in their official capacity or were not explicitly using their public offices to get meetings for paid lobbying. *Id.* § 112.313(7); Fla. Comm'n on Ethics, *Conflict of Interest; Voting Conflicts: Member of County Commission Lobbying for Compensation on Behalf of Municipal Clients Before Federal and State Government Agencies Other Than His County*,

CEO 23-6 (Oct. 25, 2023), https://ethics.state.fl.us/Documents/Opinions/23/CEO%2023-006.htm (concluding that Section 112.313(7)(a) would not bar some conduct that the in-office, paid-lobbying restriction would).

### 3. Paid lobbying by current public officeholders has limited communicative or expressive value.

Paid lobbying by elected and executive-level officeholders on political matters looks like a political endorsement. The more speech resembles a political "endorsement," and "may be exchanged between political actors on a quid pro quo basis," the more it looks like "an effort to" secure a political benefit for a third party or "assume a role as political powerbroker." *Siefert*, 608 F.3d at 984; *see also Letter Carriers*, 413 U.S. at 579–80. The lobbying benefits the paying client, not the lobbyist, except that it is exchanged for money—a financial quid pro quo. It thus looks "less" like a "communication," which "temper[s]" its "constitutional protection." *Siefert*, 608 F.3d at 984, 986.

*Siefert* is not the only case to distinguish political conduct from speech when weighing a restriction favorably to the government. *Letter Carriers* did so too. The Hatch Act allowed "express[ing] [an] opinion on political subjects and candidates," but prohibited doing so in partisan political contexts like "endors[ing]" a candidate "in a political advertisement" or at "a convention, caucus, [or] rally." *Letter Carriers*, 413 U.S. at 579. The Hatch Act thus "carve[d] out the prohibited political conduct from the expressive activity." *Id.* Like the Hatch Act, Florida's restriction also "carve[s] out the prohibited political conduct" of misusing public office by personally profiting from its

political influence "from the expressive activity" of opining on political matters. *See id.* at 579–80.

For those reasons, Florida's restriction is unlike the honoraria ban in *NTEU*. That ban burdened purely "expressive activity," without regard to "corrupt bargain[s] or even [the] appearance of impropriety." *NTEU*, 513 U.S. at 468, 474. Florida's restriction burdens less expressive "political conduct" that abuses or appears to abuse public trust. *Letter Carriers*, 413 U.S. at 579; *see also Wolfe*, 446 F.3d at 1106–08 (similarly distinguishing *NTEU*). Because Florida has not "single[d] out expressive activity for special regulation," its "burden" is not "heighten[ed]" as in *NTEU*. 513 U.S. at 475.

### 4. The restriction on receipt of fees requires less justification than a restriction on reimbursements and puts a minimal burden on audience interests.

Florida bars fees, not reimbursements. Restrictions that "bar[] . . . receiving a fee" require less justification, *Swartzwelder v. McNeilly*, 297 F.3d 228, 239 (3d Cir. 2002), than those that bar reimbursements, *Sanjour*, 56 F.3d at 94. *See also Wolfe*, 446 F.3d at 1108. Although the *NTEU* ban also barred fees, acceptance of those fees would merely have "incentiv[ized]" protected "expression." *NTEU*, 513 U.S. at 469. Here, acceptance of fees to lobby while holding public office does not innocently incentivize expression; it abuses the public trust.

Florida's restriction also burdens the interests of potential audiences less than in *NTEU*. There, the financial "disincentive" imposed "a significant burden on the public's right to read and hear what the employees would otherwise have written and said."

*Id.* at 470. The Supreme Court had "no way to measure the true cost of that burden," but it could not "ignore the risk that it might deprive [the public] of the work of a future Melville or Hawthorne." *Id.* Here, the restriction affects no audience other than the governmental bodies being protected from untoward influence.

### 5.    The restriction is neither content- nor viewpoint-based.

Finally, Florida's in-office, paid-lobbying restriction poses no risk of distorting or manipulating public debate. *See, e.g.*, *Letter Carriers*, 413 U.S. at 564–65; *Sanjour*, 56 F.3d at 96–97. The district court nevertheless said that the restriction was content-based because it "do[es] not prohibit *all* compensated lobbying, but only compensated lobbying on 'issues of policy, appropriations, or procurement.'" DE110 at 18 (quoting Fla. Const. art. II, § 8(f)(2)). As indicated above, that conclusion is erroneous.

First of all, it is difficult to imagine what other subject matter in the area of legislation or regulation would not be covered by "issues of policy, appropriations, or procurement." The definitions of "issue of policy," "issue of appropriations," and "issue of procurement" are capacious. *See* Fla. Stat. § 112.3121(7)–(9). Neither Garcia nor the district court has ever identified a legislative or regulatory issue that falls outside the scope of the restriction. *See* DE52 at 15 n.3 (conceding as much).

Second, to the extent the phrase "policy, appropriations, or procurement" could be said to "target" anything, it clearly does not do so on the basis of "communicative content." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022). The restriction uses "issue," "decision," and "action" interchangeably. *See* Fla. Stat.

31

§ 112.3121(7)–(9), (11)(a)1.–4. Indeed, the district court recognized as "content neutral," DE110 at 19, the statutes challenged in *Florida Association of Professional Lobbyists, Inc. v. Division of Legislative Information Services of the Florida Office of Legislative Services*, 525 F.3d 1073, 1079–80 (11th Cir. 2008), which used "decision" and "action" the same way. The laws here identify "issues of policy, appropriations, or procurement" as areas of restriction only because they present legitimate reason for concern that an officeholder could distort governmental decision-making by selling influence for personal profit. *See, e.g.*, *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 121–22, 125 (2011) (holding that ban on legislators' "advocat[ing] the passage or failure" of legislative matters that posed conflicts for them was "content-neutral" apparently because the ban required examination of content only in service of drawing neutral, conflicts-based lines). The in-office, paid-lobbying restriction is "agnostic" about the subject matter on which an officeholder wants to lobby—let alone the messages expressed. *See City of Austin*, 596 U.S. at 69.

Even if Florida's restriction were content-based because it singles out political "issues," it would be justified under *NTEU* balancing because it is inextricably intertwined with the danger it legitimately targets. *See Letter Carriers*, 413 U.S. at 564–65; *Siefert*, 608 F.3d at 987. Courts have justified restrictions that draw similar distinctions based on partisan context. In *Letter Carriers*, the Hatch Act's partisan distinction was inextricably intertwined with the danger it targeted: preventing the mix of partisan political influence with routine federal service. *See* 413 U.S. at 564–65. Similarly, in *Siefert*,

judges could endorse only in nonpartisan elections. That distinction was "justified" because it reflected practical realities—partisan officials appeared more often in court than did nonpartisan ones, threatening too many recusals—and endorsements in nonpartisan elections would not make a judge look like a "spokesperson for [a] party." *Siefert*, 608 F.3d at 987. Like each of these, Florida's distinction based on issues of policy, appropriations, or procurement is tied to the danger it is targeting and is thus justified.

* * * * *

In the end, the district court acknowledged that the restriction "would likely survive some version of *Pickering*/*NTEU* balancing." DE110 at 38. It was able to reach its ruling only by starting with the erroneous premise that *Pickering*/*NTEU* balancing did not apply. Because Floridians' interest in preventing the abuse of public office flowing from current public officeholders lobbying for pay on political matters outweighs the interests of both the lobbied and the restricted officeholders, the Court should reverse the district court's holding that the restriction is unconstitutional and vacate the permanent injunction.

### C.    Alternatively, Florida's in-office, paid-lobbying restriction is subject to intermediate scrutiny, which it also easily survives.

If the Court were to decline to apply *NTEU* balancing, Florida's restriction would still be subject only to intermediate scrutiny, because it is content-neutral. *See supra* I.B.5; *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1223 (11th Cir. 2022). Under intermediate scrutiny, a restriction must be "narrowly drawn to further a substantial

governmental interest . . . unrelated to the suppression of free speech" or, as a time-place-manner restriction, be "narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291–92 (11th Cir. 2021) (citation omitted). Florida has a significant government interest in preventing current officeholders from exchanging political favors for money, and its in-office, paid-lobbying restriction is narrowly drawn to further that interest. *See supra* I.B.1–2. It furthermore leaves open ample alternative channels for communication. Officeholders can reach the same audience with the same message on the same matter as long as they are not paid. Florida's restriction thus would survive scrutiny even if it were not subject to *NTEU* balancing.

Florida's restriction on paid lobbying on political matters is much like the time-place-manner restriction upheld in *Carrigan*. The law there prohibited a legislator with a conflict of interest from voting or advocating for a matter's passage or failure during legislative debate. 564 U.S. at 119. The advocacy restriction was a "reasonable time, place, and manner limitation" because "[l]egislative sessions would become massive town-hall meetings if those who had a right to speak were not limited to those who had a right to vote." *Id.* at 121–22. If that was enough to restrict public officials' speech on political matters based on conflicts of interest, Florida's interest in restricting their speech based on the conflict that results from pay is more than sufficient.

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING A UNIVERSAL PERMANENT INJUNCTION.

Even if the district court was correct to rule that Florida's in-office, paid-lobbying restriction violated the First Amendment, it erred in entering a statewide injunction. It is "well-settled that a district court abuses its discretion when it grants relief that is improperly or even unnecessarily broad." *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 870 (11th Cir. 2013). The Supreme Court has made clear that equitable remedies should be "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1921 (2018) (same). The Supreme Court and this Court have therefore repeatedly admonished that an injunction should generally apply only to the party before the court. *See NTEU*, 513 U.S. at 477–78; *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1304–08 (11th Cir. 2022). Here, a statewide injunction is unnecessary to provide complete relief to Garcia, the only plaintiff with standing in the case.

### A.    An injunction limited to Garcia would afford him all the relief to which he is entitled.

Absent specific statutory authority, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring), federal courts may not issue equitable remedies that contravene "traditional remedial principles" or "historical practice." *Georgia*, 46 F.4th at

1303.[9] Universal injunctions "appear to conflict with several traditional rules of equity." *Trump*, 138 S. Ct. at 2425 (Thomas, J., concurring).[10] One is that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Georgia*, 46 F.4th at 1303. Another is to "'take care to make no decree [that would] affect' the rights of nonparties." Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 427 (2017) (quoting *Joy v. Wirtz*, 13 F. Cas. 1172, 1174 (C.C.D. Pa. 1806) (No. 7,554) (Washington, Circuit Justice)); *see also Georgia*, 46 F.4th at 1303. Equity did recognize an exception that "permit[ted] a portion of the parties in interest to represent the entire body." *Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356, 363 (1921) (quoting *Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 303 (1853)). This device—variously termed the "representative suit" or "bill of peace"—was the precursor of the modern Rule 23

---

[9] *See also Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) ("the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789"); *Boyle v. Zacharie & Turner*, 31 U.S. 648, 658 (1832) (Story, J.) ("[T]he remedies in equity are to be administered . . . according to the practice of courts of equity in the parent country.").

[10] The question at issue here involves the non-statutory remedial powers of the federal courts. That question is distinct from whether a court is authorized to vacate federal agency action as to parties other than the challenging plaintiff under the Administrative Procedure Act, which authorizes courts to "set aside" unlawful rules. 5 U.S.C. § 706 (2); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012–16 (2018).

class action. *See* Joseph Story, *Commentaries on Equity Pleadings* §§ 77–135, at 101–78 (4th ed. 1848); Frederic Calvert, *A Treatise upon the Law Respecting Parties to Suits in Equity* 30–34 (2d ed. 1847); *Hansberry v. Lee*, 311 U.S. 32, 41 (1940) ("The class suit was an invention of equity[.]"). But this is not a class action. Because Rule 23 has replaced the representative suit in modern equity jurisprudence, Garcia cannot invoke these older exceptions to do an end-run around the requirements of Rule 23. *See Georgia*, 46 F.4th at 1306 ("Several procedural devices" allow those "with similar interests to seek the protection of injunctive relief—class certification under Rule 23, joinder and intervention in an existing lawsuit, or even filing a new lawsuit of their own. A district court cannot circumvent these mechanisms in the name of providing injunctive relief only for non-parties' benefit."); *Rodgers v. Bryant*, 942 F.3d 451, 464 (8th Cir. 2019) (Stras, J., concurring in part and dissenting in part).

The traditional equitable remedy most analogous to what Garcia seeks here—the injunction to stay proceedings at law—was "directed only to the parties." 2 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 875, at 166 (2d ed. 1839). For example, in *Scott v. Donald*, the respondent had sued certain constables of South Carolina, arguing that they had confiscated his alcohol under a statute that was unconstitutional. 165 U.S. 58, 66, 78–86 (1897). This Court agreed that the statute was unconstitutional. *Id.* at 99–101. But in a separate opinion, it reversed the award of an injunction protecting everyone else subject to the statute. *See Scott v. Donald*, 165 U.S. 107, 115–17 (1897). As this Court explained, "[t]he theory of the decree is that

37

the plaintiff is one of a class of persons whose rights are infringed and threatened, and that he so represents such class that he may pray an injunction on behalf of all persons that constitute it." *Id.* at 115. "It is, indeed, possible that there may be others in like case with the plaintiff, and that such persons may be numerous[.]" *Id.* "[B]ut such a state of facts is too conjectural to furnish a safe basis upon which a court of equity ought to grant an injunction." *Id.*

The Supreme Court reaffirmed these principles in *Lewis*, holding that a "systemwide" injunction went beyond the equitable powers of a district court even when directed to the one Article III injury found in that case: inadequate legal services for illiterate prison inmates. 518 U.S. at 359–60 & n.7. Two inmates had incurred that injury: one whose illiteracy had led to the dismissal of a complaint and another who "had once been unable to file a legal action" because of his illiteracy. *Id.* at 359–60 (cleaned up). But these shortfalls "were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief." *Id.* at 359. "[G]ranting a remedy beyond what was necessary to provide relief to [the two inmates] was therefore improper." *Id.* at 360.[11]

---

[11] When a plaintiff requires broad relief to get complete redress, the injunction may rightly be broad, but it is still party-specific. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) ("[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit . . . if such breadth is necessary to give prevailing parties the relief to which they are entitled." (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987)).

**B.**    **Neither facial invalidity nor overbreadth standing entitles Garcia to universal relief.**

As noted above, a motions panel of this Court has already reached this conclusion in staying the preliminary injunction in this case in its application to all public officers except the plaintiffs with standing. *See* Order of the Court at 2–3, *Garcia v. Exec. Dir., Fla. Comm'n on Ethics*, No. 23-10872 (11th Cir. June 5, 2023), DE33. In concluding otherwise, the district court reasoned that the proper remedy for facial overbreadth is to enjoin all enforcement. DE110 at 39. But the district court had previously used the same rationale to justify universal preliminary injunctive relief. *See* DE52 at 22–23. In granting the partial stay, the motions panel considered and rejected that rationale as inconsistent with *Georgia. See* Order at 2–3, *Garcia*, No. 23-10872, DE33 ("need to protect third parties"—i.e., to prevent chilling third parties' protected speech—does not "warrant[]" preliminary injunction's "broad application to every 'public officer'").

There were three serious flaws with the district court's stubborn refusal to narrow the scope of its injunction. The first was that, having already determined (incorrectly) that the in-office, paid-lobbying restriction was unconstitutional as to Garcia, the district court had no cause to consider whether the restriction was facially overbroad as

---

"Injunctions barring public nuisances [a]re an example[:] While these injunctions benefit[] third parties, that benefit [i]s merely a consequence of providing relief to the plaintiff." *Trump v. Hawaii*, 138 S. Ct. at 2427 (Thomas, J., concurring). This kind of injunction is not universal, at least not in the problematic sense of being broader than necessary to afford the plaintiffs complete relief. Such injunctions benefit nonparties in a way that is "merely incidental." *Id.* That is not true of the permanent injunction in this case.

well.[12] The second was that the district court failed to determine that the restriction "'prohibit[ed] a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" *United States v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). All it said, in passing, was that the statute was "overbroad," referring back not to any discussion of the range of the statute's application but to the court's erroneous application of strict scrutiny. DE110 at 39.

The third, and most fundamental, error was that the district court "conflate[d] the merits of a legal claim with the scope of the remedy for that claim." Order, *HM Florida-ORL, Inc. v. Gov. of Fla.*, No. 23-12160, 2023 WL 6785071, at *5 (11th Cir. Oct. 11, 2023) (Brasher, J., dissenting from denial of partial stay). Overbreadth is not an exception to the rules of Article III standing. It is an exception to the rules for *prudential* standing, *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984), specifically, the rule that a party "cannot rest his claim to relief on the legal rights or interests of third parties," *Warth v. Seldin*, 422 U.S. 490, 499 (1975). It thus expands the range of substantive arguments that a plaintiff can raise on the merits. *See* Henry P. Monaghan,

---

[12] "It is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied. Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws." *Renne v. Geary*, 501 U.S. 312, 324 (1991) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989)); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501–04 (1985).

*Overbreadth*, 1981 Sup. Ct. Rev. 1, 4 (1982). But it says nothing about the relief to which a successful plaintiff is entitled, which is still limited to the plaintiff's injury in fact. *See* Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 853–54, 881 (1991).

The Supreme Court made that point clear in *NTEU*. There the Court held that a federal statute banning federal employees' receipt of honoraria violated the First Amendment. It reasoned that the prohibition was overbroad in extending to "employees below grade GS-16." 513 U.S. at 477. But it still ruled that an injunction preventing enforcement of the statute "should be limited to the parties before the Court." *Id.* As this Court explained, "we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *Id.* at 478.

The Court reached the same remedial conclusion after sustaining an overbreadth claim in *Doran*. There, this Court affirmed the award of a preliminary injunction preventing a New York town from enforcing an ordinance banning topless dancing against two of the three respondent corporations in the case. The Court found that the two corporations were likely to succeed on their claims that the ordinance was overbroad in its application both to establishments that served liquor and to establishments that did not. 422 U.S. at 932–33. But the Court reversed the award of a preliminary injunction preventing enforcement of the ordinance against the third respondent on grounds of *Younger* abstention, given that the third respondent was already being prosecuted in state court. *Id.* at 929. "Moreover," said the Court, "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with

respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute." *Id.* at 931.

In its order denying the State Defendants' motion for a particular stay, the district court attempted to shore up its justification for the universal injunction with additional case law. But the cases on which the court relied, *see* DE118 at 3–6, do not support its position. For example, the district court said that the Supreme Court's ruling in *New York v. Ferber* "explained" that "a successful overbreadth challenge entails not simply 'revers[ing] the particular conviction' but rather invalidating the challenged law." *Id.* at 5 (quoting 458 U.S. 747, 773 (1982)). The passage cited and partially quoted by the district court in fact states nothing of the kind: "Indeed, the Court's practice when confronted with ordinary criminal laws that are sought to be applied against protected conduct is not to invalidate the law *in toto*, but rather to reverse the particular conviction." *Ferber*, 458 U.S. at 773. The Court went on to hold that the statute at issue was "not substantially overbroad." *Id.* The case thus provides no guidance as to the appropriate remedy when a statute *is* found to be overbroad. Indeed, the district court relied almost exclusively on cases where the claims failed on the merits—meaning the courts did not even address the scope of relief available for a facially unconstitutional statute or regulation. *See* DE110 at 39 (citing *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1300 (11th Cir. 2017)); DE118 at 3–5 (discussing *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 618 (1973)); *id.* at 5 (citing *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003), and then citing *Hansen*, 599 U.S. at 784–85).

For all these reasons, the district court abused its discretion by enjoining enforcement of the restriction against nonparties and Plaintiffs without standing.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision on the merits and vacate the permanent injunction entirely or, in the alternative, vacate it as to anyone but Garcia.

Dated: October 25, 2023

Respectfully submitted,

ASHLEY MOODY
*Attorney General*

HENRY C. WHITAKER
  *Solicitor General*
DANIEL WILLIAM BELL
  *Chief Deputy Solicitor General*
NATHAN A. FORRESTER
  *Senior Deputy Solicitor General*
*/s/ Alison E. Preston*
ALISON E. PRESTON
  *Deputy Solicitor General*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3681
*alison.preston@myfloridalegal.com*
*jenna.hodges@myfloridalegal.com*

*Counsel for Defendants–Appellants–*
*Cross Appellees*

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,710 words.

2.     This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5), and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Alison E. Preston*
ALISON E. PRESTON

44

**CERTIFICATE OF SERVICE**

I certify that on October 25, 2023, I electronically filed this Initial Brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Alison E. Preston*
ALISON E. PRESTON